UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
J & J SPORTS PRODUCTIONS, INC.,

                              Plaintiff,

                                                        **REPORT AND**
            -against-                                   **RECOMMENDATION**
                                                        15-CV-6546
MARGARITA FERREIRAS,
LA REINA DEL SUR RESTAURANT & BAR, INC.

                              Defendants.
-----------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

        Plaintiff J & J Sports Productions, Inc. ("J & J") brought this action alleging that

defendants Margarita Ferreiras and La Reina Del Sur Restaurant & Bar, Inc. ("La

Reina") unlawfully intercepted and misappropriated a closed-circuit television

broadcast of a boxing match held on September 14, 2013 between Floyd Mayweather, Jr.

and Saul Alvarez (the "Event").[1]

        This is one of hundreds of cases that J & J has initiated in the Eastern District of

New York.[2]  By this Court's count, J & J has brought 474 cases in this District since the

advent of electronic filing.  With rare exception, the defendant fails to appear, and J & J

moves for default judgment.  J & J's motions for default judgment have been denied at a

---

[1] Mayweather won the fight in a 12-round majority decision.

[2] This does not include cases brought prior to the advent of electronic filing, or
cases brought by entities other than J & J, but which are filed by the same attorney and
make the same or almost identical allegations.  *See, e.g.*, *G & G Closed Circuit Events,
LLC v. Dominican Rest. 3 Corp.*, No. 16-CV-4163, Compl. dated July 27, 2016, Dkt. No. 1
(E.D.N.Y.); *Joe Hand Promotions, Inc. v. Plattduetsche Park Rest., Inc.*, No. 15-CV-936,
Compl. dated Feb. 23, 2015 (E.D.N.Y.); *Innovative Sports Mgmt., Inc. v. MI Olivia
Rest., Corp.*, No. 14-CV-875, Compl. dated Feb. 7, 2014 (E.D.N.Y.); *Garden City Boxing
Club, Inc. v. Flor De Luna Corp.*, No. 07-CV-3848, Compl. dated Sept. 14, 2007
(E.D.N.Y.).

dizzyingly high percentage. Since 2005, judges in this Court have ruled on 139 motions for default judgment and denied, in whole or in part, 34 of those motions, a staggering 24.5%. For cases initiated since 2015, judges have ruled on 19 motions for default judgment and have denied, in whole or in part, 16 of them, an astonishing 84.2%. Appendix A attached to this Order summarizes these results.[3]

Judges have taken time to issue detailed written decisions outlining the bases for denying the motions, the reasons for which are manifold: failures to serve the defendant with a complaint,[4] to serve all the defendants against whom default is sought,[5] to serve the authorized agent of a corporation as opposed to any employee,[6] and to follow the

---

[3] These numbers do not include cases where motions were filed but later withdrawn either because of settlement, appearance of the defendant, or the Court alerting J & J to a deficiency in its application. Nor do these numbers include the dozens of cases where motions have not been filed, but the case has been withdrawn after the Court has identified a deficiency in the Complaint, service, or other filings by J & J. Further, these numbers do not include the present case, where there have been two prior denials of the default judgment motion and this Court recommends yet another.

[4] *J & J Sports Prods., Inc. v. La Parranda Mexicana Bar & Restaurante Co., Inc.*, No. 17-CV-4171, 2018 WL 4378166, at *1–2 (E.D.N.Y. Apr. 9, 2018) (determining the complaint was served on the incorrect restaurant).

[5] *J & J Sports Prods., Inc. v. Tacos Mexicanos*, No. 08-CV-1076, Report and Recommendations dated Aug. 5, 2008, Dkt. No. 10, at 2 (E.D.N.Y.) ("Although plaintiff sought the default of both defendants, the Clerk of the Court has noted the default only of the individual defendant Camerino Torres. In fact, the docket sheet contains no indication that defendant Tacos Mexicanos was ever served with the complaint in this action. The Court's internal records do indicate, though, that a member of the Clerk's Office staff spoke with plaintiff's counsel's office on or about July 1, 2008, and alerted plaintiff's counsel that no affidavit of service on Tacos Mexicanos had been filed. The Court's records further indicate that plaintiff's counsel stated that he intended to dismiss the claims against the corporate defendant, but took no further action.") (citations omitted).

[6] J & J's boilerplate affirmations of service often state that the employee who is served is the "cashier" or "authorized agent" of the corporation. Judges are regularly forced to ask J & J to explain why service is proper, because it either misapprehends what a "cashier" is or assumes, without any basis, that any employee receiving service is

Court's Local Rules for motions for default judgment,[7] including by failing to attach time and cost records or other necessary documents,[8] among other reasons.  And the failures are procedural as well as substantive.  J & J has sought default judgment against individuals without alleging the necessary elements for imposing such liability,[9] sought

---

authorized to receive service on behalf of the corporation.  *E.g.*, *J & J Sports Prods. Inc. v. RK Soto Enters. Inc.*, No. 17-CV-2636, Order dated May 8, 2018 (E.D.N.Y.) ("Plaintiff is to supplement the motion with . . . evidence as to how the service provider determined that 'Jose Pena, Manager' was known to be an authorized agent of the corporation for purposes of accepting service."); *see also La Parranda Mexicana*, 2018 WL 4378166, at *2 ("[A] cashier under CPLR § 311 is not a cashier in the colloquial sense, *i.e.* a person who takes a customer's money as payment for goods or services. . . .  The affidavit of service does not spell out any facts from which anyone could conclude that Ms. Richards was anything more than a cashier in the colloquial sense of the word.  If that is the case, then the method of service is invalid.").

[7] *E.g.*, *J & J Sports Prods., Inc. v. Aries-Friends, Ltd.*, No. 06-CV-3336, Decision and Order dated Oct. 19, 2007, Dkt. No. 10, at 1 (E.D.N.Y.) ("Plaintiff's motion for a default judgment . . . is denied without prejudice for failure to produce proof that the summons and complaint were served on defendant as required by the rules of this Court.").

[8] *E.g.*, *J & J Sports Prods., Inc. v. Meson De Colombia, Inc.*, No. 10-CV-1142, Report and Recommendation dated Oct. 7, 2010, Dkt. No. 13, at 7 (E.D.N.Y.) ("Plaintiff makes an application for attorneys fees and costs, which are recoverable under § 605(e)(3)(B)(iii), but does so without providing any supporting documentation."); *J & J Sports Prods., Inc. v. Estella Corp.*, No. 08-CV-1074, Order dated June 11, 2008 (E.D.N.Y.) ("The $700 in attorneys' fees and the additional claim for costs are not supported by any time records or sworn statements, so the Court cannot find them reasonable.").

[9] *J & J Sports Prods., Inc. v. Classico Bar Inc.*, No. 16-CV-5639, 2018 WL 2022166, at *3 (E.D.N.Y. Feb. 13, 2018) ("Therefore, Plaintiff has not satisfied its burden of showing the financial gain required to establish vicarious liability regarding the Individual Defendants.  Accordingly, the Court recommends that the motion for a default judgment against Johnson and Vargas be denied."), *report and recommendation adopted*, 2018 WL 1168582, at *1 (Mar. 6, 2018); *J & J Sports Prods., Inc. v. Shots Pool Hall, Inc.*, No. 16-CV-5067, 2018 WL 1115915, at *2 (E.D.N.Y. Feb. 6, 2018) ("The complaint's allegations of individual liability, however, are insufficient to hold defendant Roddy Ramoutar liable. . . .  Throughout the complaint, though, plaintiff uses the term 'defendants' generally to refer to both Ramoutar and the corporation, without identifying any actions specifically taken by Ramoutar."), *report and recommendation adopted*, 2018 WL 1116551, at *1 (Feb. 27, 2018); *J & J Sports Prods.,*

certificates of default against parties not named as defendants,[10] served the incorrect

parties,[11] sought recovery under statutes without specifying the section of the statute

allegedly violated,[12] brought claims under statutes that prohibit interception of satellite

communications without alleging the necessary element of such a claim,[13] submitted

---

*Inc. v. Martinez*, No. 07-CV-3455, 2009 WL 1913239, at *1 (E.D.N.Y. June 30, 2009) ("After defendants failed to respond, plaintiff moved for default judgment, which was granted on February 17, 2009 against La Frontera but denied as to Martinez.").

[10] *Compare J & J Sports Production Inc. v. La Morenita Ecuatoriana Rest. Corp.*, No. 15-CV-6507, Request for Certificate of Default dated Feb. 4, 2016, Dkt. No. 7 (E.D.N.Y.) (naming incorrect Defendants in the Notation of Default), *with id.*, Request for Certificate of Default dated Feb. 23, 2016, Dkt. No. 11 (naming the correct Defendants).

[11] In one case, Judge Scanlon noted that J & J "has started a lawsuit against a corporate defendant and an individual defendant Andres Rosario . . . . Plaintiff has requested a default judgment . . . . The affidavit of service indicates that service was made on Andres Rosario at a Union, New Jersey address. The Court received a letter from Rosario Andres who states that she lives at the Union, New Jersey address, but that she has no connection to the corporate defendant. She provides reasons why she believes that Plaintiff is mistaken as to her identity. Plaintiff is directed to investigate the facts alleged by Rosario Andres, and to take the appropriate action immediately if Ms. Andres is not the person that he intended to sue. If service was made on the wrong person, Plaintiff should note that the date for proper service passed almost four months ago. If this action is not immediately resolved, the Court will hold an in-person hearing . . . . Plaintiff's counsel is on notice that if Rosario Andres is not the proper defendant and Plaintiff fails to resolve this matter, Plaintiff may be subject to a motion for sanctions, including costs, by Rosario Andres." *J & J Sports Prods. Inc. v. El Sitio Rest. Corp.*, No. 17-CV-3388, Scheduling Order dated Dec. 29, 2017 (E.D.N.Y.) (citations omitted). J & J discontinued the action against the individual after receiving the order. *Id.*, Notice dated Jan. 23, 2018, Dkt. No. 16.

[12] *J & J Sports Prods., Inc v. Volcy*, No. 18-CV-2315, Compl. dated Apr. 16, 2018, ¶¶ 22–24 (E.D.N.Y.) (alleging violations of "Title 47 U.S.C. Section 605, *et seq.*" without providing the specific provision that Defendants allegedly violated) (decision on default judgment has not yet been issued).

[13] *E.g.*, *J & J Sports Prods., Inc. v. Paucar*, No. 17-CV-5358, 2018 WL 4501057, at *5 (E.D.N.Y. July 16, 2018) ("Absent any allegation in the Complaint that the Event in whole or in part originated as a satellite or radio communication (as opposed to a wire or cable communication), there are no facts upon which to conclude Defendant is liable under Section 605."), *report and recommendation adopted*, 2018 WL 4494874, at *1

affidavits, declarations and papers that contradict the allegations in the complaint,[14] and alleged infringement of digital rights to programming that it may not own.[15]  One could go on.  Despite the fact that for years there have been written opinions identifying these inconsistencies, failures to comply with rules, and deficiencies, J & J has apparently never bothered to change its practices.  It submits the same cookie-cutter complaints, applications, and motions in almost every case, changing only the name of the defendant and never curing the problems.  And it continues to submit supporting materials that obviously contradict the statements in the motions and complaint, which causes the Court to question whether even the most basic investigation has been conducted by J & J before filing suit.  One District Judge has ordered J & J to show cause why sanctions should not be issued for its persistent practice of filing identical complaints riddled with the same basic deficiencies.[16]  Another District Judge has asked

---

(Sept. 19, 2018); *J & J Sports Prods., Inc. v. Nacipucha*, No. 17-CV-1186, 2018 WL 2709222, at *5–6 (E.D.N.Y. May 18, 2018), *report and recommendation adopted*, 2018 WL 2709200, at *1 (June 5, 2018).

[14] *E.g.*, *J & J Sports Prods., Inc. v. Exclusive Lounge & Grill Inc.*, No. 15-CV-6534, 2017 WL 1082416, at *3 (E.D.N.Y. Mar. 22, 2017) ("The Rate Sheet, therefore, flatly contradicts the Complaint's allegation that J & J owned the exclusive license to the Event and was harmed by the unauthorized broadcast.  Those allegations are not well-pled, and the Court cannot conclude that J & J maintained a proprietary interest in licensing the Event that was infringed by Exclusive Lounge's broadcast.").

[15] *E.g.*, *Classico Bar*, 2018 WL 1168582, at *3; *J & J Sports Prods., Inc. v. Senor De Chalma Corp.*, No. 15-CV-6648, 2016 WL 7655800, at *5 (E.D.N.Y. Dec. 19, 2016) ("Based on the advertisement submitted by plaintiff, it appears that plaintiff may not have had any legal right to distribute the Event.  Accordingly, the Complaint is not well-pleaded[.]"), *report and recommendation adopted*, 2017 WL 61937, at *1 (Jan. 3, 2017).

[16] *J & J Sports Prods., Inc. v. Senor De Chalma Corp.*, 2017 WL 4481164, at *1 (E.D.N.Y. Aug. 25, 2017), *report and recommendation adopted,* 2017 WL 4481165, at *1 (Oct. 5, 2017).

J & J to explain why sanctions should not be issued for its repeated failures to abide by the Judge's individual practices, including failing to appear at initial conferences.[17] J & J files cases that it permits to languish on the docket, without filing proof of service or taking any steps to prosecute the action;[18] when prompted by a judge to prove up its case, it dismisses the action or fails to respond to the Court order.[19] Of the 474 cases,

---

[17] *J & J Sports Prods., Inc. v. Sympatoch Café Inc.*, No. 09-CV-1887, Minute and Sanction Order dated June 25, 2009, Dkt. No. 5 (E.D.N.Y.) ("[P]laintiff's counsel of record failed to appear at any of the scheduled Initial Status conferences in three separate cases. The Court imposes a sanction of $100.00 on plaintiff's counsel in each of these three cases, payable to the Clerk of the Court within seven days."); *J & J Sports Prods., Inc. v. T & G Rest. & Food Corp.*, No. 08-CV-1823, Order to Show Cause dated June 19, 2008, Dkt. No. 5 (E.D.N.Y.) ("[P]laintiff is ORDERED TO SHOW CAUSE as to why sanctions should not be imposed on plaintiff's counsel for the repeated violation of the Court's individual practice rules.").

[18] *J & J Sports Prods., Inc. v. Exclusive Lounge & Grill Inc.*, No. 16-CV-6458, Order dated Feb. 27, 2017 (E.D.N.Y.) ("A review of the docket entries in this action indicates that there has been no activity in this case since the Summons was issued[.]"); *T & G Rest. & Food Corp.*, Order to Show Cause, Dkt. No. 5, at 1–2 ("The manner in which this action has been prosecuted, together with the Court's experience with plaintiff's counsel in other cases, strongly suggests that plaintiff's counsel follows a practice of filing these infringement cases and then not looking at them again until some event occurs that requires action by plaintiff's counsel.").

[19] *E.g.*, *J & J Sports Prods., Inc. v. Tu Vacilon Sports Bar Corp.*, No. 17-CV-1189, Status Report dated Feb. 21, 2018, Dkt. No. 22, at 1 (E.D.N.Y.) ("[M]y office has done further research into the grounds for liability of the defendant, Froilan Salinas. Other than what was discussed in the hearing, we have not determined any other grounds for liability for Mr. Salinas. Therefore, we will be filing a Notice of Voluntary Dismissal of this case."); *J & J Sports Prods., Inc. v. Dolphin's Sportbar & Rest., Inc.*, No. 09-CV-3265, Order of Dismissal dated Jan. 11, 2010, Dkt. No. 4 (E.D.N.Y.) ("On November 11, 2009, Plaintiff issued a Status Report indicating that it was still awaiting completion of service. On November 20, 2009, the assigned Magistrate Judge issued a Scheduling order noting that, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, service was required by November 25, 2009, and requiring that proof of service be filed with the Court within two weeks thereafter. To date, Plaintiff has failed to file proof of service. On December 21, 2009, an Order to Show Cause was issued why this matter should not be dismissed for failure to effect timely service. A written response was due on January 4, 2010. Plaintiff has failed to respond to the Order to Show Cause."); *J & J Sports Prods., Inc. v. El Vacilon Sports Bar*, No. 17-CV-2623, Dkt. Nos. 19, 21 (E.D.N.Y.) (voluntary dismissal filed three days after being ordered to appear for inquest hearing

fewer than a handful have proceeded to any discovery and none have proceeded to disposition on the merits. It comes as no surprise then that J & J often obtains a result that should be the rarest outcome: a denial of the default judgment motion on liability.

The present case is sadly no different than the others.

J & J alleges that Defendants intercepted and received the feed for the Event without paying and displayed it to patrons at La Reina. (Compl. dated Nov. 16, 2015, Dkt. No. 1, ¶¶ 15–16). Both Defendants were served with a summons and the Complaint, and then failed to appear, answer, or otherwise respond. (Dkt. Nos. 5, 6). J & J sought and received certificates of default from the Clerk of Court. (Dkt. Nos. 7, 8). J & J filed a motion for entry of default judgment against both Defendants on April 25, 2016. (Dkt. No. 9).

Judge Vitaliano first denied the motion for default judgment on August 19, 2016. (Memorandum and Order dated Aug. 19, 2016, Dkt. No. 12 ("Aug. 19 Order")). The motion was denied because J & J failed to comply with Judge Vitaliano's individual practices or the District's Local Rules. J & J failed to file its motion for default judgment within the time specified and failed to include the required certification that the individual defendant was not a servicemember. (*Id.* at 1–2). J & J was "cautioned to re-examine <u>all</u> of the rules applicable to default judgment motions and to comply strictly with each of them." (*Id.* at 2).

_____

and submit damages calculations); *J & J Sports Prods., Inc. v. El Nuevo Sabor Latino*, No. 09-CV-4784, Dkt. Nos. 7, 9 (E.D.N.Y.) (discontinuing action after being ordered to present damages calculations); *J & J Sports Prods., Inc. v. Right Brain Rest.*, No. 15-CV-6989, Dkt. Nos. 13, 14 (E.D.N.Y.) (discontinuing action after being ordered to submit materials in support of damages and provide witness testimony from affiants); *J & J Sports Prods., Inc. v. Casa Panini Pizzeria Inc.*, No. 10-CV-1510, Dkt. Nos. 13, 14 (E.D.N.Y.) (discontinuing action after second order issued to J & J requiring attendance of auditor for hearing).

J & J tried and failed again. On October 24, 2016, it moved for a default judgment. (Dkt. No. 13). It was denied again for failure to comply with Local Rules. (Memorandum and Order dated May 12, 2017, Dkt. No. 16 ("May 12 Order"), at 2). Judge Vitaliano found that, although J & J had submitted an affidavit that the individual was not a member of the Armed Forces, J & J did not submit an affidavit certifying that the defendant was not a minor or incompetent, nor did it append the Clerk's certificate of default to its motion. (*Id.*). Almost a year later, J & J filed a third motion for default judgment. (Motion for Default Judgment dated Apr. 13, 2018, Dkt. No. 17 ("Mot. for Default J.")). Judge Vitaliano referred this motion to the undersigned for a report and recommendation. (Order dated May 9, 2018).

The third time is not the charm. While this motion complies—it appears—with the Local Rules, it fails on substantive grounds and raises serious questions as to whether the lawsuit should have been filed in the first place. J & J's cookie-cutter complaint alleges facts that are insufficient to state a cause of action under the telecommunication statutes that are the basis of its lawsuit. J & J, for reasons that have been explained in other opinions ad nauseum, also continues to misapprehend and misuse other provisions of these statutes—for instance, by erroneously insisting that an individual who intercepts a satellite transmission could be liable as a manufacturer of illegal decoding equipment. It also brought this lawsuit even though it lacks standing to do so, since it is not the licensor of the Event; G & G—a different company—had the licensing rights. This issue has also been identified for J & J countless times, and it has failed to change its practices.

There is a more serious problem. J & J brought this Complaint alleging that the Event took place on September 14, 2013. (Compl. ¶ 7). Its counsel submitted a

declaration, in support of its motion, averring that the Event was shown at La Reina on September 14, 2013. (*See* Affidavit for Judgment by Default, attached as Ex. 1 to Mot. for Default J., Dkt. No. 17 ("Att'y Aff.") ¶ 2). It calculated damages based on a fee schedule that provides prices for licensing the Event—which was to be broadcast on the evening of September 14. (*See* Rate Card, attached as Ex. 5 to Memorandum in Support of Mot. for Default J. ("Default J. Mem.") dated Apr. 13, 2018, Dkt No. 18 ("Rate Card")). J & J submitted an affidavit from an "auditor" who allegedly was at La Reina to view the illegal broadcast. (*See* Investigator's Report, attached as Ex. 4 to Default J. Mem., Dkt. No. 18 ("Investigator's Report")). According to that affidavit, La Reina broadcast the Event not on September 14, but on a different date entirely: September 15. (*Id.* ¶ 3). And it did so not in the evening, but in the afternoon of September 15. (*Id.* (stating that the auditor entered La Reina "[a]t approximately 12:35 P.M.")). This is not the first time that J & J has presented declaration from "auditors" or others whose statements strain credulity or contradict the complaint.[20] The discrepancy in this case would not have come to light had Judge Vitaliano previously not denied J & J's motion for a default judgment, since its initial moving papers did not contain this affidavit. The affidavit is dated September 18, 2013; the Court can only assume J & J was in possession

---

[20] *E.g.*, *J & J Sports Prods., Inc. v. Byza Rest. Corp.*, No. 09-CV-1773, Report and Recommendations dated Feb. 18, 2010, Dkt. No. 19, at 6–9 (E.D.N.Y.) (outlining inconsistencies between declarations of process servers and witness testimony, and finding that plaintiff had failed to establish that service had been properly effectuated on defendants); *J & J Sports Prods., Inc. v. Marrero*, No. 06-CV-239, Amended Order dated Oct. 12, 2006 (E.D.N.Y.) ("Mr. Marrero states that his establishment is not located at the address stated in the complaint and described what he believes to be other discrepancies in the investigator's report which evidence a mistake. Mr. Marrero's letter includes photographs and other documentation he believes substantiate his claims.").

of it for years.  Yet J & J filed a complaint and multiple attorney declarations seeking a judgment and damages based on facts that were inconsistent with it.

The auditor's affidavit raises red flags of another sort.  The same auditor filed an affidavit in three other cases.  In those cases, he alleges he visited three other restaurants besides La Reina within the same 30-minute period and made detailed observations about the number of patrons and other facts.  These four locations are, however, some 2.0 miles apart from each other, making it almost impossible to travel, park, and observe the conduct in the four restaurants in that time.  This same affiant has been criticized by other courts for having filed affidavits that contradict other affiants or are internally inconsistent.  It raises serious questions about the validity of the allegations against Defendants, and whether a fraud is being perpetrated by J & J in these lawsuits.

The Court need not resolve its doubts about the merits of the case or the affidavit, because the motion is based on a Complaint that does not entitle J & J to a default judgment.  The deficiencies in the Complaint are the same ones identified for J & J in other cases.  As explained below, the Court respectfully recommends that the motion be denied, and the action be dismissed without prejudice.

I.    Factual Background

The following facts and procedural history are drawn from the Complaint, unless otherwise noted:

J & J is a California corporation, with its principal place of business in Santa Clara, California.  (Compl. ¶ 4).  J & J alleges that Ferreiras is an officer, director, shareholder and/or principal of La Reina, which is located at 99-11 37th Avenue,

Corona, New York.  (*Id.* ¶ 5).  Ferreiras is listed as a principal on the La Reina liquor license issued by the New York State Liquor Authority.  (*Id.*).

J & J entered into a closed-circuit television license agreement to exhibit the Event at closed-circuit locations throughout New York.  (*Id.* ¶ 7).  The license agreement gives J & J distribution rights for closed-circuit broadcasts of the Event to various business establishments throughout the New York area.  (*Id.* ¶ 8).  In New York, the Event could only be exhibited in a commercial establishment if that establishment entered into a contract with J & J "and/or it's sub-licensee G & G Closed Circuit Events, LCC" and paid the requisite fee.  (Compl. ¶¶ 10, 11).  Transmission of the Event was scrambled, and to receive it and play it clearly required the use of electronic decoding equipment.  (*Id.* ¶ 12).  J & J provides electronic decoding equipment and satellite coordinates to establishments that contract with J & J to receive the Event.  (*Id.* ¶ 14).  Defendants, who did not contract with J & J, transmitted the Event on September 14, 2013 to patrons at La Reina.  (*Id.* ¶ 15).

On November 16, 2015, J & J brought suit against Defendants.  The Complaint contains seven causes of action, based on alleged violations of the Federal Communications Act of 1934: (1) for unauthorized receipt interception, and disclosure of communications, in violation of 47 U.S.C. § 605(a) (*Id.* ¶¶ 21–29); (2) for modifying electronic, mechanical and/or another device to intercept the Event in violation of 47 U.S.C § 605(e)(4) (Compl. ¶¶ 30–36); (3) for additional damages based on the willful violations alleged in Counts I and II (*Id.* ¶¶ 37–40); (4) for attorney's fees and costs based on the violations in Counts I and II (*Id.* ¶¶ 41–44); (5) for unauthorized receipt and interception of a cable communication in violation of 47 U.S.C § 553(a)(1) (*Id.* ¶¶ 45–55); (6) for additional damages based on the willful violation alleged in Count V

(*Id.* ¶¶ 56–60); and (7) for attorney's fees and costs based on the violation alleged in Count V (Compl. ¶¶ 61–64).

II.    Legal Standards

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for obtaining a default judgment. *See Shariff v. Beach 90th St. Realty Corp.*, No. 11-CV-2551, 2013 WL 6835157, at *3 (E.D.N.Y. Dec. 20, 2013). First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, once a default has been entered against a defendant, and the defendant fails to appear or move to set aside the default under Rule 55(c), the Court may, on a plaintiff's motion, enter a default judgment against that defendant. Fed. R. Civ. P. 55(b)(2).

Once a defendant is found to be in default, she is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). However, a court retains the discretion to determine whether a final default judgment is appropriate. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993); *see also Taylor v. 312 Grand St. LLC*, No. 15-CV-5410, 2016 WL 1122027, at *3 (E.D.N.Y. Mar. 22, 2016) ("[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right.") (citations and quotations omitted). In light of the Second Circuit's "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored." *Enron*, 10 F.3d at 95–96.

Thus, despite a defendant's default, the plaintiff bears the burden of demonstrating that the unchallenged allegations and all reasonable inferences drawn

from the evidence provided establish the defendant's liability on each asserted cause of action. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). "In other words, after default . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *A. & R. Lobosco, Inc. v. Superior Trading, Inc.*, No. 15-CV-3737, 2016 WL 5723982, at *2 (E.D.N.Y. Sept. 14, 2016) (quotations omitted), *report and recommendation adopted,* 2016 WL 5719720 (Oct. 3, 2016). And a district court "need not agree that the alleged facts constitute a valid cause of action." *Mickalis Pawn Shop*, 645 F.3d at 137 (quotations omitted).

III.     Claims Against Both Defendants

J & J has brought claims under both §§ 605 and 553 of the Federal Communications Act of 1934 (the "FCA").

A.     Claims under Section 605

Section 605 "generally prohibits the unauthorized use or publication of wire or radio communications." *Int'l Cablevision, Inc. v. Sykes* ("*Sykes I*"), 997 F.2d 998, 1007 (2d Cir. 1993). The Complaint alleges several violations of § 605—(1) for violation of various sentences of § 605(a) (Count I) and; (2) for violation of § 605(e) (Count II). (Counts III and IV seek recovery of damages, costs and fees based on the violations alleged in Counts I and II.)

1.     Section 605(a) Claims

Section 605(a) ("Practices prohibited") bars a number of acts, and J & J has alleged violations of the second, third, and fourth sentences of that section. (Compl. ¶¶ 21–29, Count I (incorrectly labeled as a violation of "47 U.S.C. § 605(e)(3)(C)(i)(II),"

the damages provision of the statute)).  These sentences are generally analyzed

separately.  *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-

1318, 2017 WL 696126, at *7 (S.D.N.Y. Feb. 15, 2017), *report and recommendation

adopted sub nom. Joint Stock Co. v. Infomir LLC*, 2017 WL 2988249, at *1 (Mar. 27,

2017).

The second sentence of § 605(a) provides that:

> No person not being authorized by the sender shall intercept any radio
> communication and divulge or publish the existence, contents, substance,
> purport, effect, or meaning of such intercepted communication to any
> person.

In common parlance, this subsection prohibits the "interception of a radio

communication . . . [and] its publication to a third party."  *Int'l Cablevision, Inc. v.

Sykes* ("*Sykes II*"), 75 F.3d 123, 131 n.4 (2d Cir. 1996).[21]

The term "radio communication," as used in the Communications Act, has long

been understood to include satellite transmissions.  *Joint Stock Co.*, 2017 WL 696126, at

*8.  "The case law leaves no doubt that the term intercept or interception means to stop,

seize, or interrupt prior to arrival; or taking or seizing before arrival at the destined

place."  *Premium Sports Inc. v. Connell*, No. 10-CV-3753, 2012 WL 691891, at *2

(S.D.N.Y. Mar. 1, 2012) (quotations omitted) (collecting cases).[22]

---

[21] The provisions in § 605(a) do not apply to *wire* communications.  *Int'l Cablevision, Inc. v. Noel,* 859 F. Supp. 69, 74 (W.D.N.Y. 1994) ("[Current versions of the second and third sentences of Section 605(a) were created] as part of the Omnibus Crime Control and Safe Streets Act of 1968, at the same time that Congress enacted the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, which was intended to govern . . . the interception of wire and oral communications."), *vacated on other grounds sub nom. Sykes II*, 75 F.3d at 123.

[22] This sentence of § 605 "protects only . . . programming as it is being transmitted via satellite signal[.]"  *Connell*, 2012 WL 691891, at *3.  "[A]ny rebroadcast of cable programming is not an interception within the meaning of the statute."  *Id.*

The third sentence of § 605(a) provides that:

No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

This subsection prohibits persons from receiving and using radio communications for the benefit of himself or others (who themselves lack authorization). "Courts have repeatedly interpreted this sentence to prohibit the unauthorized [disclosure] or use of [satellite] communications, even if the communications have been received legally." *Directv, LLC v. Wright*, No. 15-CV-474, 2016 WL 3181170, at *4 (W.D.N.Y. June 3, 2016) (quotations omitted) (collecting cases); *e.g.*, *Dish Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452, 473 (E.D.N.Y. 2012) ("Plaintiffs have alleged that the Defendants with individual accounts received the DISH signal containing the subject channels and divulged the satellite signal to World Cable and the World Cable subscribers, which were not authorized to receive the subject channels, for financial gain. These facts plausibly allege that the Defendants violated the third sentence of § 605(a)."). Unlike the second sentence of § 605(a), no "interception" is required for there to be a violation. *Joint Stock Co.*, 2017 WL 696126, at *7 ("[T]he third sentence of § 605(a) does not require pleading or proof that the defendant intercepted a satellite transmission or other radio communication."); *e.g.*, *That's Entm't v. Old Bridge Tavern*, No. 94-CV-2612, 1996 WL 148045, at *2 (N.D. Ill. Mar. 28, 1996) ("Even if there was no circumstantial evidence that Old Bridge intercepted the signal, there is direct evidence that defendant broadcast the transmission which is enough to violate the statute.").

The fourth sentence of § 605(a) provides that:

No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or

> meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

This subsection prohibits the publication of intercepted communications to unauthorized persons or use of such communications for the benefit of unauthorized persons. Sentence four is similar to sentence two. Like sentence two it requires the "interception" of a radio communication (a requirement that is lacking in sentence three); however, the interception must be knowing. *Joe Hand Promotions, Inc. v. That Place, LLC*, No. 11-CV-931, 2012 WL 2525653, at *3 (E.D. Wis. June 29, 2012). A violation of sentence three need not be a knowing violation. *Id.*

The Complaint alleges that "Defendants[ ]" engaged in "wrongful actions" that constituted a violation of these portions of § 605(a). (Compl. ¶ 23). J & J alleges that "Defendants willfully intercepted and/or received the interstate communication of the Event." (*Id.* ¶ 15).

These allegations—even when accepted as true—do not state a violation of § 605(a). The provisions of § 605(a) that J & J alleges were violated—sentences two, three and four—are based on interception, publication and/or disclosure of "radio communications." The term "radio communications" encompasses a "satellite communication." *Joint Stock Co.*, 2017 WL 696126, at *8. But the Complaint never alleges that the Event was transmitted over satellite or that it was a satellite communication. *Cf. Time Warner Cable of New York City v. Allirio*, No. 99-CV-2765, 2007 WL 1704140, at *2 (E.D.N.Y. June 12, 2007) ("Plaintiff has stated that it receives the signals for its premium and pay-per-view programming via over-the-air

transmissions from orbiting satellites and local radio towers."), *report and recommendation adopted*, Dkt. No. 46 (June 12, 2007); *Garden City Boxing Club, Inc. v. Focused Enters., Ltd.*, No. 06-CV-4874, 2007 WL 1655647, at *2 (E.D.N.Y. June 6, 2007) ("Because Garden City alleges that the Event was conveyed via satellite transmission, it has properly pleaded a claim under § 605(a)[.]"); *accord Zuffa, LLC v. Gonzalez*, No. 17-CV-1805, 2017 WL 6016403, at *2 (D. Colo. Nov. 14, 2017) ("Plaintiff alleges that . . . the Broadcast originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal[.]") (quotations omitted). The only relevant mention of "satellite" in the Complaint is where it states that Defendants modified devices to "intercept electronic decoding equipment and satellite coordinates." (Compl. ¶ 33).

Some Courts have inferred that this reference to "satellite coordinates" means that there must have been a satellite transmission. *E.g.*, *J & J Sports Prods., Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 473 (E.D.N.Y. 2009) ("The reference to satellite signals provides a sufficient basis to establish that the Fight originated with a radio transmission such that the defendants' interceptions violated section 605[.]"). But there are reasons not to follow this approach. It appears that courts that have drawn this inference have all relied on the same case—a Southern District of New York case, *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 440 (S.D.N.Y. 2001)—that drew that conclusion without providing any reason or explanation for doing so. The Court believes this approach is erroneous.

The reference to "satellite coordinates" is simply not a statement that the Event that was intercepted and broadcast at La Reina was a satellite transmission. Moreover, other portions of the Complaint suggest that the Event was *not* a satellite transmission.

The only places in the Complaint where "communications" is modified, it is not by the word satellite or radio, but by "interstate." (*E.g.*, Compl. ¶ 15 ("Defendants assisted in the receipt of the interstate communication of the Event.")). And the Complaint contains multiple causes of action—discussed below—based on a violation of § 553 of the FCA, which applies only to cable, not satellite, communications. *See, e.g.*, *Garden City Boxing Club, Inc. v. Castillo*, No. 05-CV-2953, 2006 WL 1495317, at *2 (E.D.N.Y. May 11, 2006) ("Section 553(a)(1) was intended by Congress to apply specifically to 'theft of *services offered over a cable system*[.]' Thus, Section 553(a)(1) applies only to 'theft of a service from the point at which it is actually being distributed over a cable system.'") (quoting *Sykes I*, 997 F.2d at 1008).

Moreover, it is not axiomatic that J & J's distributions are satellite transmissions. *E.g.*, *J & J Sports Prods., Inc. v. Flor De Cuba, TX, Inc.*, No. 13-CV-3282, 2014 WL 6851943, at *2 (S.D. Tex. Dec. 3, 2014) ("J & J has not established whether the Event was broadcast over cable or satellite transmissions[.]"); *J & J Sports Prods., Inc. v. Evolution Entm't Grp.*, No. 13-CV-5178, 2014 WL 3587370, at *2 (E.D. La. July 21, 2014) ("Plaintiff has not presented any competent summary judgment evidence regarding whether the boxing match was delivered via cable, satellite, or otherwise. The Gagliardi affidavit lists numerous ways in which Plaintiff's programming has been intercepted from either cable or satellite transmissions, without opining as to what actually occurred in this case."); *Joe Hand Promotions, Inc. v. Breaktime Bar, LLC*, No. 12-CV-2618, 2014 WL 1870633, at *4 (W.D. La. May 8, 2014) ("[P]laintiff has not shown whether the PPV was broadcast via satellite or cable or how Breaktime intercepted the PPV, which determines whether Breaktime's conduct violates 47 U.S.C. § 605 or 47 U.S.C. § 553.").

It is quite straightforward for J & J—the distributor of the programming that is said to have been infringed—to allege how that communication is transmitted. This is not a significant undertaking, since these facts are within J & J's knowledge. Notably, in the Second Circuit, J & J need not know or allege that the defendant received the signal via radio or satellite; all that needs to be alleged (to state a § 605 claim) is that the communication *originated* via satellite. *See Sykes II,* 75 F.3d at 131–33 (holding that § 605 applies to the interception of cable communications originating as a satellite transmission)*; Joe Hand Promotions, Inc. v. Terranova*, No. 12-CV-3830, 2014 WL 1028943, at *4 (E.D.N.Y. Mar. 14, 2014) ("[B]ecause the broadcast of the Fight *originated* with a radio transmission, the interceptions violated section 605[.]") (emphasis added).

Absent any allegation in the Complaint that the Event was a satellite or radio communication (as opposed to a wire or cable communication), there are no facts from which to conclude Ferreiras is liable under § 605(a). *See, e.g.*, *Joint Stock Co.*, 2017 WL 696126, at *7 ("The statute reaches the unauthorized retransmission of a signal that originated as a satellite transmission, even when it is thereafter received or transmitted over the internet. However, plaintiffs do not clearly allege that the Programming hijacked by the moving defendants ever traveled via satellite. I therefore conclude that Count One, as presently pleaded, fails to state a cognizable claim under § 605(a).") (quotations omitted); *G & G Closed-Circuit Events, LLC. v. Houston Hobby Invs., Inc.*, 59 F. Supp. 3d 781, 786 (N.D. Tex. 2014) (granting motion to dismiss where "Plaintiff does not allege that Defendants intercepted or received radio communications or communications traveling through the air via radio in violation of section 605").

2.  Section 605(e)(4) Claim

J & J also alleges that Defendants are liable under § 605(e)(4).  (Compl. ¶¶ 30–
36, Count II (labeled as a violation of "47 U.S.C. § 605(e)(3)(C)(i)(II)").  Section
605(e)(4) provides, in pertinent part, that

> Any person who manufactures, assembles, modifies, imports, exports, sells,
> or distributes any electronic, mechanical, or other device or equipment,
> knowing or having reason to know that the device or equipment is primarily
> of assistance in the unauthorized decryption of satellite cable programming,
> or direct-to-home satellite services, or is intended for any other activity
> prohibited by subsection (a) of this section, shall be fined not more than
> $500,000 for each violation, or imprisoned for not more than 5 years for
> each violation, or both.

Although § 605(e)(4) reads like a criminal statute, a private right of action exists for
"any person aggrieved" by a violation.  *See* 47 U.S.C. § 605(e)(3)(A); *DirecTV, Inc. v.
Mars,* No. 03-CV-73760, 2004 WL 1057752, at *2 (E.D. Mich. Apr. 16, 2004); *see also
Sykes I*, 997 F.2d at 1007.

Defendants cannot be liable under § 605(e)(4) because the provision does not
apply to users of "unauthorized decryption" equipment.  Rather, it targets the "upstream
manufacturers and distributors, not the ultimate consumer of pirating devices."  *Garden
City Boxing Club, Inc. v. Morales,* No. 05-CV-0064, 2005 WL 2476264, at *5 (E.D.N.Y.
Oct. 5, 2005) (collecting cases); *accord J & J Sports Prods., Inc. v. Sin Fronteras Rest.*,
No. 09-CV-1873, 2009 WL 3254900, at *1 (E.D.N.Y. Oct. 7, 2009).  Nothing in the
Complaint suggests that La Reina or Ferreiras was a manufacturer or distributer of such
equipment.

The Complaint tries to get around this by regurgitating the statutory language
and alleging that Ferreiras "modified" such equipment.  (Compl. ¶ 33).  Even if that
formulaic recitation satisfied the pleading requirements of *Twombly* and Rule 8, the

allegation is not enough to state a violation of § 605(e)(4).  That is because the statute simply does not apply to non-manufacturers of equipment, and the term "modifies" only applies to modifications by manufacturers or distributors.  As the Ninth Circuit has explained:

> In contrast to subsection (a)'s targeting of individuals who use piracy devices to intercept satellite signals, subsection (e)(4) aims at bigger fish— the assemblers, manufacturers, and distributors of piracy devices.  The statute's two-tier damages provision treats each class quite differently, subjecting violators of subsection (e)(4) to significantly harsher penalties than those levied against violators of subsection (a).  *See* 47 U.S.C. § 605(e)(3)(C)(i)(II). . . .  The context of subsection (e)(4) and its penalties indicate that Congress intended that it apply to those who make piracy devices for commercial purposes rather than to end-users who employ piracy devices for individual personal use.

*DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854–55 (9th Cir. 2007).  This Court is not aware of any other court in this District that has concluded that—even on default—an individual end-user is liable for violating § 605(e)(4), even where she is alleged to have "modifie[d]" a prohibited device.  *Kingvision Pay-Per-View, Ltd. v. Mendez*, No. 03-CV-2170, 2006 WL 3833014, at *3 n.5 (E.D.N.Y. Dec. 28, 2006) (adopting report and recommendation rejecting default judgment under 605(e)(4)).  "[L]ike other courts in this district, the Court finds the allegations insufficient to create liability under that Section," for the individual defendant, Ferreiras.  *Id.*

This is not the first time J & J has brought a claim under Section 605(e)(4), alleging the same facts and on the same theory.  Time and time again—for at least the last decade—the claim has been rejected.[23]  The Court is not aware of a single case in

---

[23] *Nacipucha*, 2018 WL 2709222, at *7–8; *Sin Fronteras*, 2009 WL 3254900, at *1; *J & J Sports Prods., Inc. v. Benson*, No. 06-CV-1119, 2007 WL 951872, at *3 (E.D.N.Y. Mar. 27, 2007);  *J & J Sports Prods., Inc. v. LDG Williams, LLC*, No. 11-CV-2145, 2011 WL 5402031, at *3 n.2 (E.D.N.Y. Nov. 7, 2011); *J & J Sports Prods., Inc. v. Hot Shots, Inc.*, No. 09-CV-1884, 2009 WL 3366316, at *1 (E.D.N.Y. Oct. 16, 2009);

which J & J has prevailed on such a claim in any court in the United States. At this point, for J & J to continue to bring lawsuits for alleged violations of § 605(e)(4), based on facts such as in this case, is to engage in frivolous, meritless litigation.

B.     Claims under Section 553

Section 553(a)(1) provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). In other words, it prohibits "theft of *services offered over a cable system*[.]" *Sykes I,* 997 F.2d at 1008 (quotations omitted).

The problem with J & J's claims under § 605(a)(1) plague its claim under § 553(a)(1). That is, J & J fails to allege that La Reina (or Ferreiras) intercepted or received a cable communication. The Complaint does not contain any allegation that the Event was offered over a cable system. Without such an allegation, there can be no liability under § 553(a)(1). *J & J Sports Prods., Inc. v. Rivera*, No. 14-CV-343, 2015 WL 1137473, at *3 (W.D. Tex. Mar. 12, 2015) (denying default judgment where Plaintiff failed to plead "sufficient facts to show that Defendant intercepted or received communications over a cable system as required for liability under § 553").

J & J may be inclined to think that it is caught in a kind of Catch-22: having pled simultaneously a violation of § 605(a)(1) (for a radio or satellite communication) and one for violation of § 553(a)(1) (for a cable communication), the Court has recommended that both claims be denied (even on default). This logic has some appeal—there can be no doubt (in light of the uncontested factual allegations) that the

_____

*J & J Sports Prods., Inc. v. Peralta*, No. 07-CV-3616, 2008 WL 495542, at *3 (E.D.N.Y. Feb. 20, 2008).

Event was transmitted to La Reina. And if it was not transmitted over satellite, it must have been transmitted over cable. If it was not transmitted over cable, it must have been transmitted over satellite.

Such logic is faulty. To actually plead in the alternative, J & J has to plead facts in the alternative. It has fallen short. *See generally Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) ("Under Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency[.]"). J & J did not actually allege that the Event was a satellite communication, and simultaneously allege, in the alternative, that the Event was a cable communication. Rather, it brought causes of action based on such communications but failed to state the predicate fact necessary for either violation. *See, e.g.*, *J & J Sports Prods., Inc. v. Munguti*, No. 06-CV-1282, 2007 WL 928479, at *2 (D.N.J. Mar. 27, 2007) (denying default judgment, in part, to J & J where "Plaintiff does not allege *how* Defendants intercepted the boxing match at issue. . . . The Court cannot determine which statutory section is appropriate without facts describing the manner in which the boxing match was allegedly pirated."); *Garden City Boxing Club, Inc. v. Stone*, 285 F. Supp. 2d 447, 452 (D. Del. 2003) ("[T]his court cannot adequately evaluate whether defendants' actions were a violation of either §§ 553 or 605 without facts describing the manner in which the Tyson fight was allegedly pirated.").[24] "Plaintiff here appears to be

---

[24] In the Second Circuit, liability under § 605 may exist even for a program transmitted over cable "as long as the head end of the cable system at issue receives at least some radio transmissions." *Compare Cmty. Television Sys., Inc. v. Caruso*, 284 F.3d 430, 435 (2d Cir. 2002) (citing *Sykes II*, 75 F.3d at 131 n.5), *with TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 207 (3d Cir. 2001) (declining to follow *Sykes II* and concluding "that § 605 encompasses the interception of satellite transmissions to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system and no more") (quotations omitted). Conceivably, a

proceeding under both statutes without setting forth what it is required to prove under either. Plaintiff has offered no facts or argument whether Defendants intercepted the Program over a cable wire system, so that § 553 applies, or through the air, such that § [605] applies." *J & J Sports Prods., Inc. v. Gonzalez*, No. 13-CV-3332, 2015 WL 394013, at *3 (N.D. Ill. Jan. 27, 2015).

*      *      *      *

This Court has previously recommended denial of motion for default judgment for these exact same failures on the same claims. *J & J Sports Prods., Inc. v. Nacipucha*, No. 17-CV-1186, 2018 WL 2709222, at *5–6 (E.D.N.Y. May 18, 2018), *report and recommendation adopted*, 2018 WL 2709200, at *1 (June 5, 2018). That recommendation was adopted by the District Court. Another Court has followed *Nacipucha* and reached the same result. *J & J Sports Prods., Inc. v. Paucar*, No. 17-CV-5358, 2018 WL 4501057, at *8 (E.D.N.Y. July 16, 2018), *report and recommendation adopted*, 2018 WL 4494874, at *1 (Sept. 19, 2018). The Complaints in the three actions are virtually the same. (*Compare La Reina*, No. 15-CV-6546, Compl., Dkt. No. 1, *with Nacipucha*, No. 17-CV-1186, Compl., Dkt. No. 1, *and Paucar*, No. 17-CV-5358, Compl., Dkt. No. 1). There is no reason to reach another result in this case.

C.      Individual Liability

Quite separate and apart from above issues, there are additional hurdles on imposing liability on Ferreiras, who is an individual. J & J is seeking to impose liability on Ferreiras on a vicarious liability theory, *i.e.* on the basis of the acts of La Reina. The

---

party intercepting a transmission that is initiated via satellite and then proceeds via cable could be liable under both § 605 and § 553. But, again, a plaintiff would have to allege some fact indicating the nature of the transmission; something that J & J has failed to do in this case.

Complaint, for example, alleges that "Ferreiras is an officer, director, shareholder and/or principal of La Reina . . . and had a right and ability to supervise the infringing activities complained of herein." (Compl. ¶ 5). That language parrots the requirements for vicarious liability. *J & J Sports Prods., Inc. v. Benson*, No. 06-CV-1119, 2007 WL 951872, at *7 (E.D.N.Y. Mar. 27, 2007) ("'To establish vicarious liability, . . . [plaintiff] must show that . . . [the individual defendant] had a 'right and ability to supervise' the infringing activities and had 'an obvious and direct financial interest in the exploitation of [the] copyrighted materials.'") (quoting *Softel Inc. v. Dragon Med. & Sci. Commc'ns,* 118 F.3d 955, 971 (2d Cir. 1997)). These allegations are insufficient to impose liability on Ferreiras.

*First*, for the reasons stated above, La Reina cannot be held liable for infringement. With no liability imposed on La Reina, no one—including Ferreiras— could be indirectly or vicariously liable. *Jones v. Dep't of Hous. Pres. & Dev.*, No. 06-CV-2085, 2007 WL 582751, at *2 (S.D.N.Y. Feb. 22, 2007) ("It is a well-settled princip[le] that vicarious liability cannot exist without direct liability."); Restatement (Third) of Agency § 7.03 (2006) ("[A] principal's vicarious liability turns on whether the agent is liable."). "Vicarious liability is not an independent cause of action, but rather is a legal concept used to transfer liability from an agent to a principal at trial. In the absence of agent liability, therefore, none can attach to the principal." *Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C. Cir. 1999) (citations and quotations omitted).

*Second*, even if La Reina was liable, the conclusory allegations parroting the elements of vicarious liability do not establish Ferreiras's liability. As noted above, J & J needs to establish that Ferreiras had the "right and ability to supervise" the violations, *Benson,* 2007 WL 951872, at *7, and that she had a "strong financial interest" in

25

exploiting the copyrighted materials, *J & J Sports Prods., Inc. v. Meyers,* No. 06-CV-5431, 2007 WL 2030288, *3 (S.D.N.Y. July 16, 2007).  The Complaint does so only in the most conclusory fashion.  (*See* Compl. ¶ 16 (Ferreiras "as the Principal of La Reina . . . had a direct financial gain in the infringing activities that took place[.]").

The Complaint does not "identify[ ] any actions specifically taken" by Ferreiras. *J & J Sports Prods., Inc. v. Emily Bar Rest. Inc.*, No. 15-CV-6499, 2016 WL 6495366, at *2 (E.D.N.Y. Sept. 27, 2016), *report and recommendation adopted*, 2016 WL 6495526 (Nov. 2, 2016).  Indeed, after identifying Ferreiras as a principal or officer and stating that she had a financial interest in the activity, the Complaint refers to the prohibited acts as collective ones taken by "Defendants."  (*E.g.*, Compl. ¶ 19 ("The Defendants were not authorized to intercept, receive or transmit the communication of the Event[.]")).  That is insufficient to establish that an individual had "a right and ability to supervise" the violations alleged.  *Emily Bar Rest.*, 2016 WL 6495366, at *2 (declining to recommend imposition of default judgment against individual because "in the complaint, plaintiff uses the term 'defendants' to refer to Guailacela and the corporation, without identifying any actions specifically taken by Guailacela"); *J & J Sports Prod., Inc. v. El Ojo Aqua Corp.,* No. 13-CV-6173, 2014 WL 4700014, at *4 (E.D.N.Y. Aug. 29, 2014) (recommending that the court vacate the previously granted default judgment against individual defendant, where J & J did "no more in asserting a claim against [the individual defendant] than to parrot the case law's language in boilerplate fashion"), *report and recommendation adopted*, 2014 WL 4699704, at *1 (Sept. 19, 2014).

"The Complaint's bare, conclusory allegations against [Ferreiras] fail to establish liability under Section 553 for the same reasons that the claim under Section 605(a)

fails—there are no allegations that [she] directly participated in or authorized the infringing activity . . . such that vicarious liability under the FCA would apply." *J & J Sports Prods. Inc, v. Johnny's Rest.*, No. 15-CV-6645, 2016 WL 8254906, at *4 n.4 (E.D.N.Y. Dec. 15, 2016) (collecting cases), *report and recommendation adopted*, 2017 WL 591143, at *1 (Feb. 13, 2017); *see also J & J Sports Prods., Inc. v. Daley*, No. 06-CV-238, 2007 WL 7135707, at *3–4 (E.D.N.Y. Feb. 15, 2007) (recommending default judgment be denied against individual defendant because of paucity of factual allegations), *report and recommendation adopted*, Order dated Mar. 19, 2007.

A "formulaic recitation of the elements of a cause of action" is insufficient to establish liability, even on default; a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *see also J & J Sports Prods., Inc. v. LX Food Grocery Inc.*, No. 15-CV-6505, 2016 WL 6905946, at *3 (E.D.N.Y. Nov. 22, 2016) (applying *Iqbal* in default judgment analysis and finding that similar allegations by J & J for individual liability were "insufficient to establish a prima facie case").

The cases denying J & J's motion for individual liability in default judgment motions for insufficient pleading of facts are legion.[25]  As one Court noted, "[J&J's] use

---

[25] *E.g.*, *J & J Sports Prods., Inc. v. Crazy Willy's Bar, Lounge & Rest. Inc.*, No. 17-CV-1192, 2018 WL 3742701, at *3 (E.D.N.Y. June 28, 2018), *report and recommendation adopted*, 2018 WL 3629595, at *1 (July 30, 2018); *J & J Sports Prods., Inc. v. Bleachers 67 Inc.*, No. 17-CV-3380, 2018 WL 2048367, at *1 (E.D.N.Y. May 2, 2018); *J & J Sports Prods., Inc. v. Taqueria Juarez Rest., Inc.*, No. 17-CV-4158, 2018 WL 2056181, at *4 (E.D.N.Y. Mar. 16, 2018), *report and recommendation adopted*, 2018 WL 2048370, at *1 (May 2, 2018); *Classico Bar*, 2018 WL 1168582, at *4; *J & J Sports Prods., Inc. v. El Sonador Café Rest. Inc.*, No. 17-CV-3357, 2017 WL 6397731, at *3 (E.D.N.Y. Dec. 14, 2017); *J & J Sports Prods., Inc. v. Right Brain Rest., Inc.*, No. 17-CV-1191, 2017 WL 4535928, at *3 (E.D.N.Y. Oct. 6, 2017); *J & J Sports*

of boilerplate language in its pleadings has been drawn to its attention for more than a decade." *J & J Sports Prods. v. Nest Rest. & Bar Inc.*, No. 17-CV-2194, 2018 U.S. Dist. LEXIS 120182, at *15 n.1 (E.D.N.Y. July 17, 2018), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 155612, at *1 (Sept. 12, 2018); *see also J & J Sports Prods., Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 473 (E.D.N.Y. 2009) ("To the extent that J & J wishes to assert liability against an individual in the future, it should make adequately detailed allegations in the complaint, beyond the conclusory and vague charge of mere ownership of the offending entity."). It has not changed its behavior.

      D.     <u>Other Bases to Deny Default Judgment Against Both Defendants</u>

           1.   <u>Absence of Licensing Rights</u>

In support of its motion for a default judgment, J & J submitted a "Rate Card" that details the costs for an establishment to obtain a license for the Event. The rate card states in no uncertain terms that "All commercial locations that have been licensed to carry this event must have a valid license agreement from the OFFICIAL CLOSED-CIRCUIT PROVIDER, G&G Closed Circuited Events Inc. There is NO OTHER LEGAL LICENSOR." (*Id.* (emphasis in original)). G & G Closed Circuit Events Inc. ("G & G") is not J & J, and it is not a plaintiff this case. The Rate Card, therefore, "flatly contradicts the Complaint's allegation that J & J owned the exclusive license to the Event and was

<hr>

*Prods. Inc. v. Los Toritos Bar Rest. Inc.*, No. 15-CV-6517, 2017 WL 4838819, at *4 (E.D.N.Y. Sept. 11, 2017), *report and recommendation adopted*, 2017 WL 4838758, at *1 (Oct. 24, 2017); *J & J Sports Prods., Inc. v. El Sonador Café Rest. Inc.*, No. 15-CV-6934, 2017 WL 598534, at *7 (E.D.N.Y. Jan. 3, 2017), *report and recommendation adopted*, 2017 WL 591169, at *1 (Feb. 13, 2017); *Johnny's Rest.*, 2016 WL 8254906, at *4; *J & J Sports Prods. Inc. v. GPN Bar Inc.*, No. 15-CV-6504, 2016 WL 8139019, at *4 (E.D.N.Y. Dec. 15, 2016), *report and recommendation adopted*, 2017 WL 435785, at *1 (Feb. 1, 2017); *Emily Bar Rest.*, 2016 WL 6495366, at *2.

harmed by the unauthorized broadcast." *J & J Sports Prods., Inc. v. Exclusive Lounge & Grill Inc.*, No. 15-CV-6534, 2017 WL 1082416, at *3 (E.D.N.Y. Mar. 22, 2017) (Glasser, J.). As a result, "the Court cannot conclude that J & J maintained a proprietary interest in licensing the Event that was infringed . . . . Without such interest, J & J lacks standing to bring the asserted claims." *Id.*

Perhaps J & J believed it cured this issue by adding two sentences to its otherwise standard Complaint. It alleges that J & J "utilized the services of G & G . . . to handle its marketing and sales" and "the Event could only be exhibited in a commercial establishment if said establishment was contractually authorized to do so by J & J Sports Productions, Inc. and/or it's [sic] sub-licensee G & G Closed Circuit Events, LLC." (Compl. ¶¶ 9-10). This cures nothing and creates only questions. That J & J utilizes G & G for marketing and sales says nothing about J & J's licensing rights or its standing to bring an infringement lawsuit. The Complaint still contains the language identified by Judge Glasser, namely that J & J's rights are "exclusive," (Compl. ¶ 7), which is in tension with the Rate Card's language that there is no other legal licensor other than G & G. The allegation in the Complaint that Defendants could have obtained a license from J & J is in tension with the Rate Card statement that only G & G could enter into such an agreement. If G & G is the "exclusive licensor," perhaps an allegation in the Complaint that J & J was the sub-licensee would not be inconsistent with the Rate Card and confer standing. But the Complaint alleges that G & G is the sub-licensee (and not an exclusive licensor, as the Rate Card indicates). *See J & J Sports Prods., Inc. v. Senor De Chalma Corp.*, No. 15-CV-6648, 2017 WL 4481164, at *6 (E.D.N.Y. Aug. 25, 2017) ("[T]o the extent that the Complaint alleged that J & J had exclusive rights to exhibit the Event but that it employed the services of G & G to do so, that allegation is

contradicted by the advertisement, which clearly indicates that it was G & G, not J & J, that was the 'official closed-circuit provider' of the Event and that 'there is no other legal licensor.'  In fact, based on the advertisement, which required a valid license from G & G, it appears that any party that contracted with J & J to exhibit the Event would be 'considered a pirate and treated accordingly.'  Accordingly, the Court maintains that denying default judgment and dismissing the Complaint was the just result in this case, because the allegations in the Complaint are still inconsistent with the language of the advertisement.") (citations omitted), *report and recommendation adopted*, 2017 WL 4481165, at *1 (Oct. 5, 2017).

This issue has been brought to J & J's attention so many times, the Court can only conclude that J & J has simply chosen to ignore the decision of judges of this Court. Were J & J a pro se party that ignored Court directives with such abandon, the Court would have good cause to preclude J & J from making additional filings without first receiving Court permission.  In *Exclusive Lounge & Grill Inc.*, Judge Glasser noted that J & J "knew of this issue long before it filed" its motion for a default judgment, having been alerted by another opinion by Judge Scanlon where she cited many other cases where the same facts were present.  2017 WL 1082416, at *3.  Judge Glasser found that J & J simply "ignored" Judge Scanlon's order directing it to explain the discrepancy.  *Id.* Judge Glasser warned J & J that it was on the brink of Rule 11 sanctions: "In light of the prior decisions noting these pleading deficiencies in precisely similar cases, Fed. R. Civ. P. § 11 is serially disregarded and sanctions pursuant to Rule 11(c)(3) of that Rule will be invoked for its continued disregard."  *Id.*  J & J filed the motion for default judgment in this case—with the same flatly contradictory rate card—one year *after* it was warned by Judge Glasser.

Judges Glasser and Scanlon were not the first to warn J & J. Judge Orenstein noted in 2014 that J & J had regularly failed to explain why it had standing to bring lawsuits initiated by G & G. *El Ojo Aqua Corp.*, 2014 WL 4700014, at *3 n.2. In *El Ojo*, the Court held an inquest and hearing, and at that proceeding, J & J was unable to show that it had a valid license from G & G. *Id.* at *1. And most recently, Judge Ross ordered J & J to show cause to explain "why sanctions should not be imposed based on a pattern of filing nearly identical, deficient complaints." *Senor De Chalma Corp.*, 2017 WL 4481164, at *1 (quotations omitted). Although Judge Ross did not ultimately impose Rule 11 sanctions, she did require J & J

> to submit for review the written agreements between J & J and G & G Closed Circuit Events, LLC demonstrating their relationship with one another. If no written agreement exists, J & J is ordered to submit a sworn affidavit, signed by a representative of J & J, that: (1) explains why no such agreement exists, (2) details the relationship, if any, between J & J and G & G, and (3) comments on why the advertisements submitted to courts in this district state that G & G is the sole licensor of the events in question—even though J & J continues to allege that it holds the exclusive rights to exhibit the September 14, 2013 boxing match between Floyd Mayweather, Jr., and Saul Alvarez.

*J & J Sports Prods., Inc. v. Senor De Chalma Corp.*, No. 15-CV-6648, 2017 WL 4481165, at *1 (E.D.N.Y. Oct. 5, 2017).

Although the present case also involves the September 2013 match between Mayweather and Alvarez and is the same complaint and motion for default judgment except against different defendants, J & J failed to correct the issues identified by Judge Ross and proceeded to file the same motion for default judgment, after Judge Ross's decision was issued. Perhaps J & J hopes to be forced to repeat the exercise Judge Ross imposed. So be it. The Court recommends that J & J be required to provide the evidence ordered by Judge Ross in Case No. 15-CV-6648 described above, namely that

J & J be required to submit its written agreements with G & G Closed Circuit Events,

LLC demonstrating the relationship between the two organizations, and potentially be

required to provide live witnesses to explain the documents submitted.

2. <u>Inconsistencies with Auditor's Report</u>

The Complaint alleges that the Event was broadcast on September 14, 2013, and

that Defendants illegally intercepted and broadcast it on that same date to La Reina's

patrons. (Compl. ¶ 15 ("On Sept. 14, 2014 . . . Defendants willfully intercepted . . . the

Event.")). J & J's counsel submitted a revised memorandum of law in support of J & J's

motion for default judgment attesting that "[o]n the night of the Event, Cosmo Lubrano

observed the Event being telecast to the patrons of La Reina . . . . A copy of Cosmo

Lubrano's affidavit is attached . . . . While the Event was being broadcast . . . , Cosmo

Lubrano[ ] observed that there were approximately Fifty (50) patrons located on the

premises." (Default J. Mem. at 3).

This is not what Lubrano's affidavit says. Lubrano's affidavit states that at 12:35

PM on September 15, 2013 he entered La Reina and saw the Event being broadcast.

(Investigator's Report). September 15 was not the date of the Event, but the day after.

The Event took place in the evening or nighttime, not at 12:35 in the afternoon.

Lubrano's affidavit does not support the allegations in the Complaint or the

memorandum.

This is not the first time that a Court in this District has found inconsistencies in

declarations or affidavits filed by Lubrano and those made by counsel, *Joe Hand

Promotions, Inc. v. El Norteno Rest. Corp.,* No. 06-CV-1878, 2007 WL 2891016, at *1

n.1 (E.D.N.Y. Sept. 28, 2007) ("Lubrano's affidavit does not reflect the representations

made in plaintiff's affirmation. Rather, the space reserved for the establishment's

estimated capacity was left blank."), or discrepancies between Lubrano and other affiants, *Morales*, 2005 WL 2476264, at *8 ("The Picicci and Lubrano Affidavits establish repeated violations at the establishment, although the Court notes several discrepancies between the affidavits regarding the interior of the defendant premises. For instance, Picicci and Lubrano have different estimates of the establishment's maximum capacity and current occupancy at the time of their observations—Picicci estimates capacity and occupancy as 60, Lubrano as 75. In addition, Picicci found the establishment to be 'pretty crowded' and observed 'people at tables' on the night of the Event, while Lubrano described the establishment as 'jam-packed' and the crowd as 'mostly standing' on the night of the Barrera/Morales match.") (citations omitted).

In another case, also involving this same Event, Lubrano submitted a declaration stating that he was at a different restaurant—in Jackson Heights, Queens (Los Toritos Bar)—on September 15, 2013 at 12:07 pm, observing the broadcast. *J & J Sports Prods. Inc. v. Los Toritos Bar Rest. Inc.*, No. 15-CV-6517, 2017 WL 4838819, at *1 n.2 (E.D.N.Y. Sept. 11, 2017), *report and recommendation adopted*, No. 15-CV-6517, 2017 WL 4838758, at *1 (E.D.N.Y. Oct. 24, 2017). In a third case, Labrano submitted an affidavit stating that he was at yet another restaurant in Jackson Heights (Emily Bar and Restaurant) at 12:29 PM on September 15, 2013 observing the Event. (*Emily Bar Rest.*, No. 15-CV-6499, Dkt. No. 14 Ex. B). Lubrano was also allegedly at a fourth restaurant (Senor De Chalma in Jackson Heights) at 12:20 PM on September 15, 2013 observing the Event. *J & J Sports Production v. Senor De Chalma Corp.*, No. 15-CV-6648, Dkt. No. 9 Ex. B.

For Lubrano to go from Los Toritos at 12:07 to Senor De Chalma at 12:20, then to Emily Bar at 12:29, and finally to La Reina at 12:35, he would have had to visit four

locations in 28 minutes, traversed 1.5 to 2.0 miles by foot or car (according to Google Maps and Bing Maps, respectively), all while counting the number of patrons present, becoming familiar enough with the location to complete an affidavit, and observe the Event on television screens.  Unless someone has mastered the technology to teleport, Lubrano either drove two miles (according to Google Maps) and parked multiple times, walked between the locations, or did some combination thereof in the allotted 28 minutes.  It all beggars belief and common sense.  However, it reeks of fraud.

The Court need not make that determination in order to deny the motion for default judgment.  Based on the record in this case alone, there is a clear contradiction between the Complaint, the attorney affirmation, and Lubrano's affidavit.  The Complaint alleges that the Event took place on one date, and Lubrano viewed the allegedly infringing activity not on that date, but another one.  This contradiction indicates that the complaint's allegations are not well-pled, and therefore the motion for default judgment on liability grounds cannot be granted.  *Trans World Airlines, Inc. v. Hughes*, 308 F. Supp. 679, 683 (S.D.N.Y. 1969) ("Defendants may show, however, that an allegation is not well pleaded, but only in very narrow, exceptional circumstances. . . . For example, an allegation made indefinite or erroneous by other allegations in the same complaint is not a well-pleaded allegation. Other examples . . . are allegations which are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case."), *supplemented*, 312 F. Supp. 478 (S.D.N.Y. 1970), and *aff'd*, 449 F.2d 51 (2d Cir. 1971) (referring to district court's default standard as "entirely correct"), *rev'd sub nom. Hughes Tool Co. v. Trans World Airlines, Inc., on other grounds*, 409 U.S. 363 (1973); *Colabella v. Am. Inst. of Certified Pub. Accountants*, No.

10-CV-2291, 2011 WL 4532132, at *4 n.6 (E.D.N.Y. Sept. 28, 2011) (following *Trans World Airlines*); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *see also* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2685 (4th ed.) ("In determining whether to enter a default judgment, the court is free to consider a number of factors that may appear from the record before it. . . . Among the factors considered are . . . whether the grounds for default are clearly established or are in doubt.") (citations omitted).

IV.    Sanctions

In addition to denying the motion for default judgment, the Court recommends that J & J be ordered to show cause why sanctions not be imposed upon on it. The Court makes the recommendation for the following reasons:

1.    As detailed above, the Complaint in this case contains allegations—related to the basis to impose individual liability and whether J & J has standing—that J & J has repeatedly been on notice are insufficient. J & J has been on notice of these issues for upwards of a decade. Nonetheless, J & J in this case filed the same Complaint that has been identified as problematic. At a minimum, J & J should be required to provide the evidence ordered by Judge Ross in Case No. 15-CV-6648, and potentially be required to provide live witnesses to explain the documents submitted in response. It should also be required to explain the good-faith, non-frivolous basis to continue to bring claims alleging violations of Section 605(e)(4), and its basis for bringing such a claim in this case.

2.     J & J filed this Complaint on November 16, 2015.  It presumably had in its possession the Lubrano affidavit, which was executed in 2013, at that time.  In any event, it certainly had the affidavit on April 25, 2016 when it attached the document to the first motion for default judgment.  It submitted three attorney affidavits on April 25, 2016, October 24, 2016, and April 13, 2018, respectively, stating that the Event was broadcast or intercepted by Defendants on a date different from that in the Lubrano affidavit.  At no time, and for years, despite filing the affidavit three times, did J & J identify or correct the discrepancy, but continued to prosecute the case on the basis that the Event was broadcast by Defendants on September 14.  J & J should be required to explain, either in writing through sworn declarations from counsel, a representative of J & J, and the auditor or by presentation of witness testimony, or both, its course of conduct in this litigation.

<u>Conclusion</u>

For the reasons stated above, it is respectfully recommended that the default judgment motion be denied, the Complaint be dismissed without prejudice, and J & J be ordered to show cause why sanctions should not be imposed.

Any objections to the Report and Recommendation above must be filed with the Clerk of Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[] [judge's] report operates as a waiver of any further judicial review of the magistrate[] [judge's] decision.").

J & J shall serve a copy of this Report and Recommendation on the Defendants and file proof of such service in the record.

SO ORDERED.

_/s/ Sanket J. Bulsara November 20, 2018_
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

Appendix A

J & J Cases in E.D.N.Y. with Denial of Default Judgment

| Denied (in whole or part) |
| --- |
| 06-CV-238 |
| 06-CV-245 |
| 06-CV-6066 |
| 07-CV-3455 |
| 08-CV-1076 |
| 08-CV-1824 |
| 09-CV-1773 |
| 09-CV-1862 |
| 10-CV-3333 |
| 11-CV-4422 |
| 12-CV-4926 |
| 12-CV-5548 |
| 13-CV-6173 |
| 13-CV-6196 |
| 13-CV-6233 |
| 14-CV-5335 |
| 14-CV-5336 |
| 14-CV-7075 |
| 15-CV-2497 |
| 15-CV-3771 |
| 15-CV-6499 |
| 15-CV-6504 |
| 15-CV-6505 |
| 15-CV-6517 |
| 15-CV-6534 |
| 15-CV-6645 |
| 15-CV-6648 |
| 15-CV-6934 |
| 16-CV-5067 |
| 17-CV-2194 |
| 17-CV-2196 |
| 17-CV-2620 |
| 17-CV-3357 |
| 17-CV-5358 |